Case 1:21-mj-00474-GMH   Document 1-1

Case: 1:21-mj-00474
Assigned to: Judge Harvey, G. Michael
Assign Date: 6/14/2021
Description: COMPLAINT W/ ARREST WARRANT

# STATEMENT OF FACTS

## Introduction

1. Between on or about April 20, 2021 and on or about April 21, 2021, T.L., a sixteen-year-old female with a date of birth in 2004 (the "Complainant"), was assaulted and kidnapped by a group of individuals. Initially, the Complainant told responding police officers and medical personnel that she did not know the individuals, but that they followed her into her apartment in Southeast Washington, D.C., assaulted her, and stole belongings from the apartment and from her person. The Complainant repeated this story to a D.C. Metropolitan Police Department ("MPD") detective who interviewed her at the hospital, and again on April 22, 2021 when she reported to MPD's Seventh District Police Department for an interview.

2. In subsequent interviews occurring later in the day on April 22, 2021, and a few days later on April 26, 2021, the Complainant volunteered that though she feared for her life, she was willing to tell law enforcement what actually happened to her. During the subsequent interviews, the Complainant explained that she was assaulted by at least five individuals, four men and one woman – all of whom appeared to be searching for a stash of stolen guns that the Complainant's deceased boyfriend had given her to hold days before. The men have been identified as Nathaniel HOLMES ("HOLMES"), DeMarco ALLGOOD ("ALLGOOD"), Malik HILL ("HILL") and an unknown subject ("Target 5"), whom the Complainant described as a skinny man wearing a black hoodie. The woman has been identified as Donaesha HAWKINS ("HAWKINS").

3. After being assaulted by the individuals for more than an hour, HOLMES, ALLGOOD, HILL, and Target 5 made the Complainant lead them to a location in Maryland where she believed the guns were located. After transporting her back to Washington D.C., HOLMES raped the Complainant.

## Initial Interviews of the Complainant

4. On April 21, 2021, at approximately 7:40 AM, an adult female identifying herself as the Complainant's mother contacted MPD to report that the Complainant needed medical assistance at 870 Southern Avenue, Apartment 403 in Southeast, Washington, D.C.

5. At approximately 8:32 AM, the Complainant's mother, MPD, and members of the District of Columbia's Fire and Emergency Medical Services ("DC FEMS") responded to the address and attempted contact with the Complainant. MPD and DC FEMS subsequently breached the door to the residence after they heard noises coming from inside of the apartment but could not get anyone to open the bolt-locked door. Once inside, MPD officers located the Complainant, who was laying underneath a blanket on the bathroom floor of the residence. The Complainant was naked underneath the blanket. She was groaning and appeared to be in severe pain. Additionally, the Complainant was, at times, unresponsive, seemingly occasionally losing consciousness. There was also a dog loose in the apartment.

6. On scene, the Complainant reported to MPD officers that she had been assaulted by several unknown males who had followed her into the home after she walked her dog. The Complainant advised that one of the unknown males stated, "where the shit at?" The Complainant reported that she was knocked unconscious during the assault. After the Complainant regained

consciousness, she locked the front door and attempted to take a shower but instead passed out on the bathroom floor. When the Complainant regained consciousness again, she contacted a family member who then contacted the Complainant's mother. When asked on scene, the Complainant indicated that she was not sure whether she had been sexually assaulted. The Complainant said that she did not know who had attacked her. The Complainant's mother told MPD officers on scene that a television and two security cameras were missing from the apartment.

7. The Complainant was transported to Children's National Medical Center ("CNCM") by DC FEMS for treatment. There, she was interviewed by medical personnel and by an MPD detective. The Complainant reported that, on the evening of April 20, 2021, she attended a vigil for her boyfriend, who had recently been killed. After the vigil, she went to a neighbor's residence. Around 11:45 PM, the Complainant realized that her dog needed to be walked. The Complainant advised that she returned home from walking her dog when six individuals followed her to her apartment and kicked in the door. The Complainant reported that all of the individuals began to kick and punch her in the head and face. The Complainant saw the individuals assaulting her dog before she eventually lost consciousness. The Complainant reported losing consciousness several times over the course of the assault, which she estimated lasted about an hour. The men said things such as "we should kill her." One man took her phone and, while searching through it, began saying out loud where her family lived and where she went to school. The men also took jewelry from her body. The Complainant reported that she did not know how long she was unconscious for, but advised she called a friend shortly after she regained consciousness. The Complainant was unable to describe the men, explaining that it happened so fast. She remembered that, except for one man, they were all tall. She also recalled that the men had guns.

8. Because of her inability to recall whether she had been sexually assaulted, medical personnel offered a to do a sexual assault examination. The Complainant agreed, and a Physical Evidence Recovery Kit was collected by a Sexual Assault Nurse Examiner ("SANE"). The SANE noted during the examination that the Complainant had bruising behind her right ear, left arm, right shoulder, and lips. The Complainant also had a small laceration to her upper lip. In general, the Complainant appeared to be traumatized.

9. On April 22, 2021, after the Complainant had been released from the hospital, the Complainant was interviewed by a Seventh District ("7D") MPD detective. During this interview, the Complainant largely provided the same story. She explained that she used to date a person named "Dirty." The Complainant advised that "Dirty" had been the victim of a homicide the previous week.

10. On the night of the assault, the Complainant walked back to her apartment with her dog when "a whole rack of people kicked the door in." The Complainant later advised that there was a total of six people in her apartment. The Complainant reported that her dog bit one of the people on the leg or pants. The dog was thrown against a wall and then locked in a bedroom. The people asked her where the "stuff" was before repeatedly assaulting her. The Complainant advised that she did not know the people and that they were all wearing black clothing with ski masks covering their faces except for their eyes. Some of the men were wearing gloves. The Complainant initially reported that she had not seen anyone with a gun, but later reported that one of the people pulled a gun and pointed it at her dog. The Complainant also stated that she had been hit in the

head with a gun. The Complainant reported that they stole a television, necklace, and bracelet from the apartment and that the men went through her phone. The men threatened to harm her if she told anyone. The Complainant was kicked in the face and lost consciousness.

### *Subsequent Interviews*

11.  Shortly after the interview with the 7D detective was complete, the Complainant told the 7D MPD detective that she had not been truthful with him.  A second interview was then conducted on the same day, April 22, 2021, with the same detective. The Complainant was formally interviewed two additional times: on April 22, 2021 by a separate set of MPD detectives and on April 26, 2021 by a detective assigned to the MPD Youth and Family Services Division ("YFSD") Physical and Sexual Abuse Branch ("PSAB"). These subsequent interviews were consistent with one another. The April 26, 2021 interview was the most detailed.

12.  The Complainant confirmed her address and told MPD detectives that she had dated a man named "Dirty" for approximately a month and half before he was shot and killed on Wheeler Road on April 15, 2021. A few days before he was killed, "Dirty" had given the Complainant a Pink brand bag. "Dirty" told the Complainant to take the bag into her apartment and to not look into it. The Complainant brought the bag to her apartment and immediately looked inside. The Complainant saw two guns and a small bag with white powder.

13.  The day after she learned that "Dirty" had been killed, the Complainant posted to Instagram live a video of herself smoking marijuana and holding the guns that were in the bag given to her by "Dirty." The video was posted on Instagram live at approximately 3:00 AM on April 16, 2021. The Complainant kept a copy of the video on her phone, which she showed MPD detectives.

14.  Within a day of posting the Instagram video, the Complainant's cousin contacted her and told her that she needed to get the guns out of her house. The cousin advised that he would take them from the Complainant, which he did a couple days prior to a candlelight vigil for "Dirty" on April 20, 2021.

15.  On April 20, 2021, the Complainant attended the candlelight vigil for "Dirty." Afterwards, she returned to her neighborhood in the 800 block of Southern Avenue, Southeast.  A group of no more than approximately 20 individuals gathered in the parking lot of her apartment building. While in the parking lot, a male with long dreadlocks (ALLGOOD), approached the Complainant and asked her, "You the girl that Dirty used to fuck with?" The Complainant told ALLGOOD that she was, and ALLGOOD asked her if "Dirty" had left anything with her or in her house. The Complainant told ALLGOOD that she would check later, and ALLGOOD took the Complainant's phone and put his number, 301-XXX-3256, into her phone. The Complainant reported that ALLGOOD called his number from her phone so that he had the Complainant's number.

16.  The Complainant returned to her apartment and was hanging out with a friend (who ultimately left the apartment before the assault began). A short time later, at 10:27 PM, ALLGOOD called the Complainant and he started questioning the Complainant as to why she had not called

him and why she was trying to avoid him. The Complainant made up an excuse to get off the phone with ALLGOOD.

17. The Complainant received a text message from Witness 1 at approximately 11:17 PM, and Witness 1 told the Complainant that she was coming over to the Complainant's house. Witness 1 arrived approximately twenty minutes later. Shortly after Witness 1 arrived, around approximately 11:48 PM, ALLGOOD again called the Complainant. The Complainant pretended her phone was messed up during this call, but ALLGOOD called back at 11:54 PM and asked about the stuff "Dirty" left with her. The Complainant told ALLGOOD that she only had some "white stuff" and ALLGOOD told her to bring it outside. The Complainant met ALLGOOD outside and turned over the "white stuff." ALLGOOD told the Complainant to let him know if she found anything else in the house.

18. The Complainant reported that ALLGOOD was outside with a man she recognized as "Nae Nae" (later identified as Nathaniel HOLMES), as well as a light skin skinny male wearing a black hoodie with something on the front of the hoodie (Target 5), and a fat guy wearing a gray hoodie (later identified as Malik HILL).

19. The Complainant returned to her apartment and Witness 1 was still there. Witness 1 left shortly after the Complainant returned. The Complainant reported that someone knocked on the door soon after Witness 1 left. The Complainant looked through the door's peep hole and saw only Witness 1. The Complainant opened the door and ALLGOOD, HOLMES, HILL and Target 5 pushed the door open and rushed into her apartment. ALLGOOD said to the Complainant, "Where that shit at?" The men pushed the Complainant through the house and searched her home. The Complainant believed that the men were trying to find the bag "Dirty" gave her.

20. The men pushed the Complainant back into the living room of the home and stood over the Complainant yelling at her and demanding to know the location of the guns. ALLGOOD "jacked her up" (physically assaulted her) and said that they knew "Dirty" gave her the guns. HILL stated that they should just kill the Complainant. The Complainant observed a two-tone black in color handgun on the small of HILL's back.

21. Witness 1 was present for the assault and threats but did not participate.

22. The Complainant reported that she was scared and told the men that she had given the guns to her cousin. The men made the Complainant call her cousin several times starting at 12:10 AM on April 21, 2021, until he answered with the phone on speakerphone. The Complainant told her cousin, "where the stuff at, because they are about to kill me," or words to that effect. The Complainant reported that HOLMES knows the Complainant's cousin, and he told her cousin that if the "stuff don't turn up, she dead," or words to that effect. The Complainant's cousin denied having the guns. The Complainant told the men that her cousin was lying.

23. The Complainant's cousin requested that he be taken off speakerphone and told the Complainant that the men were faking and were not going to hurt her. The Complainant reported that she begged her cousin to tell the men because she thought they would kill her. ALLGOOD

told the Complainant's cousin that if the men did not have the guns in forty minutes, they would kill the Complainant. ALLGOOD then hung up the phone.

24. The Complainant advised that HOLMES then called a woman whom they referred to as "Dirty's baby momma"[1] (later identified as Donaesha HAWKINS) and told her to come over because they had something to handle. When HAWKINS arrived, one of the men told her that the Complainant had "Dirty's shit" and would not tell the men where it was. HAWKINS took off her jacket and started to hit and punch the Complainant all over her body. HAWKINS kicked the Complainant in the knee, causing her to fall to the ground. HAWKINS kicked the Complainant while she was on the ground and then ALLGOOD pulled the Complainant to her feet by the Complainant's hair so that HAWKINS could continue beating the Complainant.

25. The men then questioned the Complainant about where her cousin lived and where the guns were. Eventually, the group forced the Complainant out of the apartment and to the parking lot. One of the men told the Complainant to stand next to a specific car and that they would kill her if she moved. The Complainant then got into a car with HOLMES and Witness 1, and they left the apartment complex.

26. The men took three different vehicles, with HOLMES, the Complainant, and Witness 1 in an orange or peach four-door Kia. ALLGOOD and HILL rode in an older red four-door car. Target 5 rode in a gray two-door car the Complainant described as an Infiniti.

27. HOLMES stopped prior to leaving D.C. and dropped off Witness 1. Neither HAWKINS, nor Witness 1 accompanied the group to Maryland.

28. After dropping off Witness 1 near her residence, the Complainant then directed HOLMES to Suitland Parkway, and then to an apartment complex in Maryland where she believed the guns were. The two other vehicles followed. The men did not attempt to enter the apartment in Maryland. Instead, after the Complainant pointed out the building, the group decided to return to D.C.

29. HOLMES quickly drove the Complainant back to D.C. HOLMES spoke with someone on the phone on the way back to D.C. The Complainant believed HOLMES was talking to the other men. HOLMES told the Complainant that he had been driving quickly because the other men wanted to kill her. The Complainant explained that this did not make sense to her because HOLMES told the other men to meet back at the Complainant's apartment complex. Regardless, HOLMES told the Complainant that he saved her life.

30. HOLMES drove back to the Complainant's apartment complex where HOLMES reunited with the other men, including ALLGOOD and HILL. The Complainant reported that

---

[1] The Complainant told the 7D MPD Detective that though the men referred to HAWKINS as "Dirty's baby momma," the woman looked different than the woman who identified herself as the mother of Dirty's child at the candlelight vigil earlier that evening.

5

ALLGOOD displayed a gun and said if the guns do not show up in two to three days, he would kill her. All the men except for HOLMES then drove off.

31. The Complainant and HOLMES returned to her apartment and HOLMES got a rag and began to clean blood off the Complainant's face. HOLMES walked into the bathroom and turned on the shower and told the Complainant to take a shower. The Complainant complied and returned to her bedroom after the shower wearing a towel. The Complainant was not able to put her clothes on because HOLMES had put all of her clothes into a bag. The Complainant walked to a mirror in her bedroom and started looking at the bruises on her body. HOLMES then approached the Complainant from behind started kissing and touching her shoulders. The Complainant told him no, and HOLMES responded, "I just saved your life. You could do something…. just come on," or words to that effect. HOLMES became irritated and told the Complainant that he just did all of this for her.

32. The Complainant walked away from HOLMES, who followed her and pushed her over the bed with her chest facing into the bed. HOLMES removed the towel she was wearing and began kissing and touching her body. HOLMES pulled his pants and underwear down and ordered the Complainant to get a condom, which she did. HOLMES removed the condom from the wrapper, placed it on his penis and then forced his penis into the Complainant's vagina against her will. The Complainant disclosed that HOLMES put his "dick" inside of her and it was "hard" and "it hurt." The Complainant reported that the assault lasted approximately twenty to thirty minutes.

33. The Complainant reported that HOLMES finished and walked into the bathroom to clean himself. The Complainant advised that HOLMES returned to the bedroom and ordered the Complainant to get on her knees in front of him. The Complainant stated that she told him no and HOLMES threatened to call back the other men to hurt her. The Complainant disclosed that she begged him not to call the other men and got on her knees. HOLMES placed one hand on the Complainant's neck and another on her head as he forced her down to his penis. HOLMES then told her to "suck it" and placed his penis in her mouth against her will. The Complainant stated that he penetrated her mouth with his penis for approximately fifteen minutes, until he told her to stop.

34. HOLMES told the Complainant that he was going to McDonald's and that he would bring her something back. He told the Complainant not to talk to anyone. HOLMES also told the Complainant that if he called, she better answer the phone. The Complainant was afraid that HOLMES would return with the other men and was scared that they would come back to the apartment. The Complainant reported that she was also afraid to leave because she was afraid the men were still outside or would come back. The Complainant attempted to contact HOLMES several times via the telephone number of 202-XXX-8431, which had been stored in her phone prior to April 20, 2021, but HOLMES did not answer. At one point, HOLMES finally answered, asking the Complainant what she wanted from McDonald's. The Complainant reported that HOLMES returned to her apartment with McDonald's for her. HOLMES left after dropping off

6

the food. The Complainant called HOLMES over 20 times between the time when he left to get McDonald's and when MPD arrived at her apartment later that same morning.

35. The Complainant eventually called a friend, who got in contact with some of the Complainant's family. This phone call led to MPD and DC FEMS responding to her apartment.

36. The Complainant advised that she knows HOLMES from around her neighborhood and that she knows him as "Big Homie" and "Nae Nae." The Complainant also identified HOLMES' Instagram account as "sonofademon" and showed the YFSD Detective an image from that account which depicted three men standing on a sidewalk, whom she identified (from left to right) as HILL, ALLGOOD, and HOLMES.

*Law Enforcement Investigation*

37. MPD and FBI personnel conducted searches of open source and law enforcement only databases to identify the involved targets.

38. ALLGOOD provided his telephone number to the Complainant, 301-XXX-3256. A database search was conducted for any information regarding this phone number. Subpoenaed subscriber information obtained from T-Mobile for this number revealed no subscriber information. However, law enforcement discovered that this number is publicly registered to DeMarco ALLGOOD (DOB: 07-XX-1997) and that this phone number had been his reported point of contact after he was arrested in Prince George's County, Maryland for numerous firearm and firearm related offenses in November 2020.

39. Additionally, a driver's license photograph belonging to ALLGOOD was located by FBI personnel. This photograph appeared to be the man standing in the center of the Instagram photograph identified by the Complainant.

40. In a subsequent interview with the YSFD detective, the Complainant reported that HOLMES has a tattoo on the center of his forehead. The profile picture for "sonofademon" was enlarged, revealing what looked to be a tattoo on his forehead. The profile picture was distributed to members of the Seventh District Crime Suppression Team ("CST"). A member of the team reviewed the photograph and reported that they believed this individual to be Nathaniel HOLMES (DOB: 11-XX-1994). A photograph of HOLMES was obtained and appeared to be the male standing on the right of the Instagram photograph identified by the Complainant.

41. Law enforcement reviewed the arrest of ALLGOOD in Prince George's County, Maryland on November 17, 2020 and found that Malik HILL (DOB: 04-XX-1997) was present in the vehicle at the time ALLGOOD was arrested. A photograph of HILL was obtained and appeared to be the male standing on the left of the Instagram photograph identified by the Complainant.

42. Additionally, call detail records ("CDR") were obtained by law enforcement for ALLGOOD and HOLMES. A phone number of (202) XXX-8395 was identified as being contacted by ALLGOOD and HOLMES during the timeframe of the kidnapping. This telephone number is also linked to several cellular phone applications to include an Uber account. An administrative subpoena was issued for subscriber information for the identified Uber account. Uber reported that the account is registered to HILL, who has linked the (202) XXX-8395 and an

7

email address which includes his full name to the account. The Uber account is still active and has been active since June 10, 2016.

43. The Complainant's mother also forwarded an Instagram screenshot of a female who the Complainant identified as the woman to whom the men referred as "Dirty's baby momma." The photograph was taken from the Instagram page "sheso_anti." An administrative subpoena was issued for the account by a member of the FBI for subscriber and internet protocol ("IP") addresses. Instagram reported that the account had been registered with an email address of donnaeshah@gmail.com and with and telephone number 202-XXX-7635. A member of the FBI conducted a record check of open source and law enforcement only databases and determined that the account likely belonged to Donaesha HAWKINS (DOB: 03-XX-1994). Subpoenaed subscriber information obtained from T-Mobile confirms that 202-XXX-7635 is subscribed to HAWKINS.

44. On May 11, 2021, the Complainant identified ALLGOOD, HOLMES, HILL, and HAWKINS in separate photo identification procedures.

45. The Complainant was shown a photo spread containing nine photographs of individuals which included ALLGOOD in position #7 of the photo spread and asked if she recognized anyone. The Complainant immediately identified ALLGOOD in the photo spread and advised, "Damn I recognized one." The Complainant also reported that she was "very, very, very sure" regarding how confident she was of the identification.

46. The Complainant was shown a single photograph of HOLMES and asked whether she recognized the individual. The Complainant reported that she knows the man as "Nae Nae" and has known him for more than a year.

47. The Complainant was also shown a photo spread containing nine photographs of individuals which included HILL in position #4 of the photo spread and asked if she recognized anyone. The Complainant immediately identified HILL in the photo spread and advised, "This one." The Complainant also reported that she was "very sure" regarding how confident she was of the identification.

48. The Complainant was shown a photo spread containing nine photographs of individuals which included HAWKINS in position #2 of the photo spread and asked if she recognized anyone. The Complainant immediately identified HAWKINS in the photo spread but

did not make any statements during the identification. The Complainant was asked how confident she was of the identification and stated, "very sure."

49. Additionally, MPD was able to recover surveillance footage from the Complainant's apartment complex and have, in conjunction with the FBI, reviewed the provided footage and made the following observations:

   a. On April 20, 2021, at approximately 11:52 PM[2], a surveillance camera shows ALLGOOD, HOLMES, and HILL walk up a walkway away from a parking lot towards 870 Southern Avenue, appearing to follow the Complainant. These individuals then enter 870 Southern Avenue.

   b. On April 20, 2021, at approximately 11:56 PM, a four door SUV backs into a parking spot and a woman exits the car. The woman walks up the walkway towards 870 Southern Avenue and then enters the building.

   c. On April 21, 2021, at approximately 12:24, a four door sedan backs into a parking spot and HAWKINS exits the vehicle, walking, then running up the walkway to 870 Southern Avenue before entering the building.

   d. On April 21, 2021, at approximately 12:31 AM, multiple individuals including ALLGOOD, HOLMES, HILL, HAWKINS (wearing a red puffer jacket previously observed worn by the Complainant), and Target 5 as well as the Complainant exit 870 Southern Avenue and enter the parking lot. The Complainant appears to be upset and injured and is wiping at her face. An additional woman is walking behind the Complainant and strikes the Complainant in the face and body, causing the Complainant to bend over.

   e. On April 21, 2021, at approximately 12:32 AM and 1:00 AM, the Complainant is seen standing in the parking lot with ALLGOOD, HOLMES, HILL, HAWKINS, Target 5, and several other individuals. The Complainant is observed rubbing her face with her hand and eventually walking to the SUV referenced in subparagraph b, above, at 1:01 AM with HOLMES. ALLGOOD and HILL are seen entering a red four-door Sedan and Target 5 enters a grey two-door vehicle. All three vehicles leave the parking lot together and return at approximately 1:49 AM on April 21, 2021.

   f. On April 21, 2021, at approximately 1:51 AM, the Complainant and HOLMES exit the SUV and walk to the red four-door sedan where they appear to be talking to someone inside the vehicle through the open front passenger side

---

[2] The security personnel who provided the surveillance footage to MPD have advised that the time stamp visible on the footage is one hour behind the actual time. The time referenced throughout this document is the actual time.

       window. At approximately 2:04 AM, the Complainant and HOLMES walk towards 870 Southern Avenue and enter the building.

    g. On April 21, 2021, at approximately 2:51 AM, HOLMES exits 870 Southern Avenue and returns to the SUV. An unidentified individual gets into the passenger side of the vehicle and it departs the parking lot at approximately 3:00 AM.

    h. On April 21, 2021, at approximately 3:22 AM, the vehicle returns to the parking lot and parks. At approximately 3:26 AM HOLMES exits the driver side with what appear to be fast food bags and a drink cup and heads towards 870 Southern Avenue.

50.    On May 20, 2021, the Complainant was shown several still shots and video clip from the surveillance footage referenced in Paragraph 49.

51.    The Complainant identified herself, ALLGOOD, HOLMES, HILL, HAWKINS, and Target 5 in the footage. Upon seeing Target 5, the Complainant stated, "that's right he had white on his sleeves not on the front," or words to that effect, and pointed to white stripes on the sleeves of the black sweatshirt worn by Target 5. The Complainant had previously described Target 5's hoodie as black with writing on the front. The clothing descriptions previously provided by the Complainant to law enforcement otherwise matched those which were seen in the surveillance footage.

52.    On the same date, the Complainant reiterated that after the group returned from Maryland, ALLGOOD brandished a firearm. Specifically, she stated that when she and HOLMES approached the four door red sedan as referenced above in paragraph 49(f), ALLGOOD was sitting in the passenger seat and had a long gun up against the inside of the door. It was at this time that ALLGOOD indicated that if the guns do not show up in two to three days, he would kill her, as referenced in paragraph 30, above.

53.    Also on May 20, 2021, the Complainant identified the SUV referenced in Paragraph 49(b), above, as the Kia in which HOLMES drove her to Maryland and further stated that the vehicle belonged to HOLMES' girlfriend who resides in the Complainant's building, 870 Southern Avenue, and with whom the Complainant is familiar. The Complainant was shown a driver's license photograph for Myesha CAMPBELL, whom she immediately identified as HOLMES' girlfriend and the owner of the vehicle. The Complainant was shown a photograph of a Ford

Escape identified by law enforcement and the Complainant identified the Ford Escape as the vehicle she had initially described as a Kia.[3]

54. The Complainant also identified the four-door sedan referenced in Paragraph 49(c), above, as the vehicle belonging to HAWKINS.

55. On the same date, the Complainant reiterated that HOLMES stole the television from her apartment and exited the residence. She further stated that she did not hear the front gate of the apartment slam after he left, indicating that HOLMES did not leave the building with the television. The Complainant therefore believes that HOLMES brought the television to CAMPBELL's apartment downstairs.

56. On June 2, 2021, an FBI Special Agent observed HOLMES driving the Ford Escape bearing the North Carolina temporary tag. On June 7, 2021, an FBI Special Agent observed CAMPBELL exiting the same Ford Escape in the parking lot of 870 Southern Ave SE.

## **CONCLUSION**

57. Based on the above information, there is probable cause to believe that, between on or about April 20, 2021, and on or about April 21, 2021, within the District of Columbia and within Maryland, DeMarco ALLGOOD, Nathaniel HOLMES, and Malik HILL committed the offense of Kidnapping, in violation of Title 18, United States Code, Section 1201(a).

58. Based on the above information, there is probable cause to believe that, between on or about April 20, 2021, and on or about April 21, 2021, within the District of Columbia, Donaesha HAWKINS committed the offense of Kidnapping, in violation of Title 22, District of Columbia Code, Section 2001.

---

[3] On May 12, 2021, law enforcement located a gold Ford Escape in the parking lot of 870 Southern Avenue, Southeast bearing a temporary North Carolina tag. The Ford Escape visually matched the SUV referenced in paragraph 49(b), above. Information provided by the North Carolina Department of Motor Vehicles, as well as the car dealership that assigned the temporary tag, indicated that the tag is assigned to a 2018 gold Ford Escape and that the current registered owner is Myesha CAMPBELL.

59. Based on the above information, there is probable cause to believe that, between on or about April 20, 2021, and on or about April 21, 2021, within the District of Columbia, Nathaniel HOLMES committed the offense of First Degree Sexual Abuse, in violation of Title 22, District of Columbia Code, Section 3002.

                                                                                   ERIC WALSH
                                                                                    Detective, Metropolitan Police Department

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 14th day of June 2021.

                                                                                   G. MICHAEL HARVEY
                                                                                   U.S. Magistrate Judge